UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMA PORTFOLIO OWNER, LLC,
as successor to Bank of America, N.A.,

    Plaintiff,

v.                                            CASE NO.: 8:11-cv-1925-T-23EAJ

CPX TAMPA GATEWAY OPAG,
LLC, et al.,

    Defendants.
_____/

**ORDER**

CPX Tampa files an amended counterclaim (Doc. 38) against Bank of America. Relying on *Bank of America, N.A. v. Corporex Realty & Investment, LLC*, 875 F. Supp. 2d 689 (E.D. Ky. June 19, 2012) (Bunning, J.), a case that "parallels this action"[1] (Doc. 57 at 1), an October 5, 2012 order (Doc. 57) dismisses Count III and retains Counts I, II, and IV of the amended counterclaim. The Bank moves

---

[1] The October 5, 2012 order explains:

> In May, 2003, CPX Olympic Building II, LLC, (a Kentucky defendant) executed a promissory note in favor of LaSalle Bank National Association, which is a predecessor by merger to Bank of America, N.A., which is the predecessor by assignment to SMA. In October, 2006, CPX Madison Place Office, LLC, (a Kentucky defendant) executed a promissory note in favor of LaSalle Bank. In January, 2008, CPX Tampa executed a promissory note in favor of LaSalle Bank. In the Kentucky action, SMA sues CPX Olympic and CPX Madison for foreclosure. In this action, SMA sues CPX Tampa and the Association (a "potential junior lienholder") for foreclosure.

(Doc. 57 at 1-2)

(Doc. 154) for summary judgment on the remaining three counts – (1) that the Bank breached an implied duty of good faith and fair dealing (Count I), (2) that promissory estoppel requires the Bank to pay reliance damages to CPX Tampa (Count II), and (3) that the Bank breached the loan agreement by denying CPX Tampa the right of first refusal (Count IV).

## BACKGROUND

On January 17, 2008, CPX Tampa borrowed $9.74 million dollars from LaSalle Bank National Association, a predecessor-in-interest to Bank of America. (Doc. 1-2 at 1; Doc. 154-1 at 7)  CPX Tampa and Bank of America negotiated to extend the loan but failed to reach an agreement before the loan matured on February 1, 2011.  (Doc. 154 at 3; Doc. 184 at 8)  On February 1, 2011, the Bank sent a "pre-negotiation letter agreement" to CPX Tampa for CPX Tampa to sign, but the Bank failed to sign before sending the agreement.  (Doc. 154-1 at 7)  On approximately February 25, 2011, CPX Tampa returned a signed copy of the agreement to the Bank.  (Doc. 154 at 13)  The parties continued to negotiate but in June 2011 terminated the negotiations without modifying the loan agreement. (Doc. 154 at 5)  In September 2011, the Bank sold the loan to SMA in the Atlas Loan Sale as part of a large portfolio of loans.  (Doc. 154 at 6; Doc. 184 at 10)

**DISCUSSION**

*1. Right of First Refusal*

In Count IV, CPX Tampa argues that the Bank breached the loan agreement by denying CPX Tampa the right of first refusal. (Doc. 38 at 24) The loan agreement states:

> 8.9 **Assignment of Lender's Rights Under this Note; Borrower's Right of Refusal.** . . . Lender agrees that in the event that it determines to assign or sell the Note or any portion thereof to any person or entity not affiliated with Lender, Lender shall, provided Borrower is not then in default under this Note or any of the Loan Documents, allow Borrower or Borrower's affiliates a right of first refusal to purchase same . . . .

(Doc. 1-2 at 12-13) In the motion for summary judgment, the Bank argues that the Bank never triggered the right of first refusal because the Bank "determined" to sell CPX Tampa's loan after CPX Tampa defaulted on February 1, 2011. (Doc. 154 at 8) Although CPX Tampa argues that the Bank's change in exposure strategy from "decrease" to "out" indicates that the Bank "determined" to sell the Loans before CPX Tampa defaulted, the Bank defines the "out" exposure strategy as:

> Credit Exposure is unacceptable at any level. New requests should not be entertained nor existing loans renewed except as a means to accomplishing a complete payout.

(Doc. 149-4 at 34) The Bank argues that under this definition of the exposure strategy the "out" designation allows the Bank to extend an existing loan "for the purpose of accomplishing a complete payout." (Doc. 154 at 11)

Citing *Corporex*, CPX Tampa responds that "determines to sell" means "whenever [the Bank] made a decision to sell the note" (Doc. 184 at 11) and that

"[w]hen [the Bank] first conceived of the idea to sell the Tampa Loan is necessarily a disputed issue of fact" (Doc. 184 at 12). In addition to arguing that the change in exposure strategy indicates that the Bank "determined" to sell the loan, CPX Tampa asserts (1) that, in August 2010, the Bank had determined to "get ours first," (2) that Gary Katunas, the Bank's corporate representative, admitted that unless CPX Tampa defaulted the Bank could not easily sell the loan because of CPX Tampa's right of first refusal, (3) that the Bank transferred the loan to the Special Assets Group in December 2010, and (4) that paragraph 55 of the SAG Transfer Loan Form denied that any modification or extension was "in process" at the time of the transfer. (Doc. 184 at 13-14)

A motion for summary judgment can "identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). "[T]he totality of the circumstances," *Lippert v. Cmty. Bank, Inc.*, 438 F.3d 1275, 1282 (11th Cir. 2006), must show a genuine issue of material fact about whether the Bank "determined" to sell CPX Tampa's loan before February 1, 2011. Although the change in exposure strategy alone might not create a genuine issue of material fact, the event, coupled with the attendant circumstances, creates a genuine issue of material fact about the Bank's breaching the loan agreement. Accordingly, Count IV withstands summary judgment.

*2. Implied Duty of Good Faith and Fair Dealing*

In Count I, CPX Tampa argues that the Bank breached an implied duty of good faith and fair dealing in the loan agreement. (Doc. 38 at 22-23) In the motion for summary judgment, the Bank argues that "[t]he covenant of good faith and fair dealing cannot be invoked to prevent the exercise of contractual rights" (Doc. 154 at 19) and that the Bank merely exercised the "contractual right to foreclose" on CPX Tampa's property, *Corporex*, 875 F. Supp. 2d at 700.[2] CPX Tampa argues, "[T]he covenant of good faith and fair dealing does not require a party to modify the terms of an Agreement, and does not apply where a party allegedly reneges on a proposal." (Doc. 154 at 19) (internal quotation marks omitted)

Citing *Corporex*, CPX Tampa responds that "[Count I] simply do[es] not relate to the ordinary exercise of [the Bank]'s contractual rights and remedies." (Doc. 184 at 22) But "a party may still breach the implied duty of good faith and fair dealing if it acts dishonestly or unreasonably in carrying out the contract." (Doc. 184 at 22 (quoting *Corporex*, 875 F. Supp. 2d at 689))

"Every contract contains an implied covenant of good faith and fair dealing." *Corporex*, 875 F. Supp. 2d at 699. This covenant "cannot be invoked to prevent the exercise of contractual rights." (Doc. 154 at 19 (citing *Farmers Bank & Trust Co. of Georgetown, Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005)) Although

---

[2] In the motion for summary judgment, the Bank fails to clarify which "right[] under the Loan Documents" the Bank was "simply exercising." (Doc. 154 at 20) *Corporex* analyzes a similar argument in the motion to dismiss and clarifies that the Bank means the "contractual right to foreclose." *Corporex*, 875 F. Supp. 2d at 700.

- 5 -

the mortgage includes the remedial right to foreclose in the event of default, the lender's procuring or inducing a default creates a defense to the default and, hence, a defense to the foreclosure. CPX Tampa alleges that the Bank "engaged in misleading, drawn-out negotiations that were never intended to bear fruit." (Doc. 184 at 22) With reasonable inferences drawn in favor of CPX Tampa, the circumstances create a genuine issue of material fact. *Lippert*, 438 F.3d at 1282; *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1366 (11th Cir. 1999) (finding "circumstantial evidence" sufficient to bar summary judgment).

CPX Tampa alleges that, before CPX Tampa had a chance to respond to the Bank's proposal to extend the loan, the Bank scheduled to transfer the loan to the Special Assets Group. (Doc. 184 at 23) When the Bank transferred the loan to the Special Assets Group in December 2010, no extension or modification was "in process." (Doc. 184 at 23) Further, CPX Tampa alleges that the Bank "insist[ed] on . . . new onerous terms"[3] to induce CPX Tampa to terminate negotiations (Doc. 184 at 9) and that the Bank approved the Atlas Portfolio Sale "[w]ithin days" after CPX Tampa rejected the new terms (Doc. 184 at 9). These factual allegations, as a whole, create a genuine issue of material fact about the Bank's breaching the implied duty of good faith and fair dealing. Accordingly, Count I withstands summary judgment.

---

[3] The new terms required "(1) [the Bank to have] 'sole and absolute discretion' regarding budgets, appraisals, distributions, expenses, and leases; (2) [the Bank to] control[] all escrow accounts; (3) additional indemnification by Borrowers; (4) waiver and release by Borrowers of any existing or potential claims; (5) [the Bank]'s preservation of prior or potential claims against Borrowers; (6) waiver of bankruptcy protection; and (7) waiver of jury trial." (Doc. 184 at 9)

*3. Promissory Estoppel*

    *A. Parol Evidence Rule*

In Count II, CPX Tampa argues that promissory estoppel requires the Bank to pay reliance damages to CPX Tampa. (Doc. 38 at 23) In the motion for summary judgment, the Bank argues that CPX Tampa bases the promissory estoppel claim on "parol statements that involve precisely the same subject matter as" the pre-negotiation letter agreement. (Doc. 154 at 22) CPX Tampa responds that "[a]n action for reliance damages under promissory estoppel provides a . . . remedy for an unfulfilled or fraudulent promise" and that the Bank "reneged on its promises [and] negotiated in bad faith." (Doc. 184 at 27-28)

Also, the Bank argues that the "alleged acts and misrepresentations that relate to [CPX Madison's loan and CPX Olympic's loan]" "are not the subject of this action" and cannot support the promissory estoppel claim. (Doc. 154 at 21) CPX Tampa responds that the Bank "required CPX Tampa to negotiate the three loans . . . together as a package deal," "necessarily ma[king] the negotiations and representations of all the loans relevant to the issues in this case." (Doc. 184 at 27)

"Promissory estoppel is an equitable doctrine for enforcing the right to rely on promises." *Rucker v. Everen Sec., Inc.*, 811 N.E.2d 1141, 1142. Although the parol evidence rule might prevent CPX Tampa from enforcing "representations" covering "precisely the same subject matter" as the pre-negotiation letter agreement (Doc. 154 at 21), CPX Tampa "seek[s] to enforce [the Bank]'s *promise to negotiate*,"

*Corporex*, 875 F. Supp. 2d at 702.  In other words, CPX Tampa seeks compensation for detrimentally relying on the Bank's promise to negotiate for an extension of the loan.  CPX Tampa alleges forbearing, in detrimental reliance on the Bank's promise, other opportunities to refinance the loan before default.  (Doc. 184 at 5)  The parol evidence rule presents no insurmountable bar to CPX Tampa's enforcing the Bank's promise to negotiate.

Further, "the negotiations and representations of all of the loans [are] relevant" to CPX Tampa's promissory estoppel claim.  Although the three loans are memorialized in separate loan agreements, the Bank's "promise to negotiate" applies to each of the three loans because the parties negotiated the extension of the three loans "as a package deal."  (Doc. 184 at 27)  For example, the parties negotiated to modify the three loans when in November 2010 and in April 2011 the parties created specific terms for the potential loan modification.  (Doc. 184 at 9)  The three CPX entities "signed nearly *identical* pre-negotiation [letter] agreements."  (Doc. 154 at 4)  On June 20, 2011, a single letter terminated negotiation for each of the three loans.  (Doc. 154 at 5-6)  Also, "[a]ll three of the Borrowers' loans were added to the Atlas Portfolio and marketed for sale."  (Doc. 184 at 10)  Because the parties negotiated the loans "as a package deal," "alleged acts and misrepresentations that relate to [CPX Madison's loan and CPX Olympic's loan]" may support CPX Tampa's promissory estoppel claim.  (Doc. 184 at 27)

*B. Statute of Frauds*

The Bank argues that Ohio's statute of frauds prevents CPX Tampa from using "Bank of America's alleged promise to extend or renegotiate the terms of the [loan agreement]." (Doc. 154 at 22) Citing *Olympic Holding Co., L.L.C. v. ACE Ltd.*, 909 N.E.2d 93, 99 (Ohio 2009), CPX Tampa responds that although "[it can] not pursue a direct contract claim because of the statute of frauds . . . [it can] pursue its promissory estoppel claim to recover damages it sustained in detrimentally relying upon [the Bank's] allegedly false promise." (Doc. 184 at 28) (internal quotation marks omitted)

In Ohio, "a party may not use promissory estoppel to bar the opposing party from asserting the affirmative defense of the statute of frauds . . . but may pursue promissory estoppel as a separate remedy for damages. *Olympic Holding*, 909 N.E.2d at 100. The Bank uses the statute of frauds as an affirmative defense by relying on *Roth v. National City Bank*, 2010 WL 4884453 (Ohio Ct. App. Dec. 1, 2010) (Dinkelacker, J.). However, CPX Tampa pursues promissory estoppel as a separate remedy for reliance damages rather than seeking to enforce a memorialized modification of the loan agreement. CPX Tampa can recover reliance damages if CPX Tampa "establishes that [the Bank's] promise to [extend the loan] is misleading or fraudulent." *Olympic Holding*, 909 N.E.2d at 100. CPX Tampa has shown a genuine issue of material fact about whether the Bank's promise to extend the loan was misleading or fraudulent.

*C. Reasonable Reliance*

The Bank argues that "CPX Tampa cannot demonstrate reasonable reliance because any negotiations were subject to a final written agreement" under the pre-negotiation letter agreement. (Doc. 154 at 23) Section 5 of the agreement "provides that no agreement or understanding shall be binding unless reduced to writing and signed by the parties." (Doc. 154 at 23) CPX Tampa responds that it acted in reasonable reliance because "a party that makes promises should not be allowed to benefit from its misstatements, lulling the other party into believing that it will deliver." (Doc. 184 at 28)

"[R]easonable reliance is a material element of a claim of fraud in the inducement." *Branch Banking & Trust Co. v. Thompson*, 2011 WL 255149 (Ky. Ct. App. Jan. 28, 2011) (Moore, J.). "The Ohio Supreme Court has . . . held that 'reasonable reliance' is a question of fact which cannot be resolved on a summary judgment motion but, rather, is for the trier of fact." *Bunton v. Trucast Tool & Mold, Inc.*, 1993 WL 164648, at *2 (Ohio Ct. App. May 7, 1993) (Mahoney, J.) (citing *Kelly v. Georgia-Pac. Corp.*, 545 N.E.2d 1244 (Ohio 1989)). Each party proffers facts either claiming or denying CPX Tampa's justifiable reliance on the Bank's promise. A trier of fact must resolve this question, so Count II withstands summary judgment.

*4. Validity of the Pre-negotiation Letter Agreement*

In addition to opposing CPX Tampa's three claims, the Bank affirmatively argues that CPX Tampa released any claim against the Bank.[4] The pre-negotiation letter agreement includes a release:

> 3. <u>Releases</u>. Each party hereto completely, irrevocably and unconditionally releases and forever discharges the other party from any and all liabilities, claims and demands whatsoever, in law or in equity, which such releasing party now has or may hereafter have against the other party caused by or arising out of or relating to all or any Loan Communications . . . .

(Doc. 154-1 at 8) The Bank argues that "CPX Tampa's [Count I] bad faith and [Count II] estoppel Counterclaims fall squarely within the scope of the release language." (Doc. 154 at 18)

CPX Tampa responds by challenging the validity of the pre-negotiation letter agreement (1) because the pre-negotiation letter agreement lacks mutual assent and consideration (Doc. 184 at 17-20) and (2) because the Bank fraudulently induced the agreement (Doc. 184 at 14-16).

*A. Mutual Assent*

The Bank argues that the Bank expressed assent to the pre-negotiation letter agreement by sending the agreement to CPX Tampa, by asking CPX Tampa to sign the agreement, and by sending CPX Tampa an updated term sheet after CPX Tampa

---

[4] Neither the October 5, 2012 order (Doc. 57) nor *Corporex* analyzes the release because the release was not "referred to in the pleading [and could] not be considered in a motion to dismiss." *Corporex*, 875 F. Supp. 2d at 697. In contrast, a motion for summary judgment can "identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact." *Hairston*, 9 F.3d at 918.

- 11 -

returned a signed copy of the agreement.[5] (Doc. 154 at 12) Citing section 5 of the pre-negotiation letter agreement, CPX Tampa responds that the agreement "explicitly stat[ed] that [the pre-negotiation letter agreement] was not enforceable unless signed by both parties" but that the Bank failed to sign the agreement within a "reasonable period of time." (Doc. 184 at 17-18)

Despite CPX Tampa's assertion,[6] the signature requirement is inapplicable to section 5 of the pre-negotiation letter agreement. Section 5 states:

> <u>Only Written Agreements</u>. No compromise, consent, release, waiver, modification or assumption agreement or understanding with respect to the Loan or the Loan Documents shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by the authorized representatives of all necessary parties to any such agreement. By executing this letter agreement, the parties hereto are precluded from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected.

---

[5] The Bank promised to send an updated loan term sheet once CPX Tampa returned the signed pre-negotiation letter agreement. "[W]ithin days after receiving the signed agreement, Bank of America sent [the updated] term sheet[]." (Doc. 154 at 13)

[6] CPX Tampa asserts that the pre-negotiation letter agreement requires itself to be signed by the parties before the pre-negotiation letter agreement itself becomes effective. CPX Tampa's argument evokes the classical, self-referential paradox. For example, this baffling assertion, commonly known as "the liar's paradox," is traditionally attributed to Epimenides, a resident of ancient Crete:

All Cretans are liars.

Are all Cretans liars or are they not? Epimenides says so, but he is a Cretan and, therefore, a liar, if he speaks the truth. Similarly, CPX Tampa argues that a contract without signatures – the pre-negotiation letter agreement – can defeat its own effectiveness by itself requiring signatures on itself before the pre-negotiation letter agreement itself becomes effective. But, how can the contract effectively require signatures without the signatures necessary to bring into effect the requirement of signatures? CPX Tampa's Ouroborian argument distinctly fails.

- 12 -

(Doc. 154-1 at 8-9)  CPX Tampa assumes that the pre-negotiation letter agreement meets the definition of "compromise, consent, release, waiver, modification or assumption agreement or understanding with respect to the Loan or the Loan Documents."  (Doc. 154-1 at 8)  However, section 5 distinguishes and excludes the pre-negotiation letter agreement by "preclud[ing either party] from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected."[7]  (Doc. 154-1 at 9)

    The pre-negotiation letter agreement is an instrument for the parties' reaching a "compromise, consent, release, waiver, modification or assumption agreement or understanding with respect to the Loan or the Loan Documents."  (Doc. 154-1 at 8)  By executing the pre-negotiation letter agreement, the Bank and CPX Tampa agree to negotiate and agree that "compromise, consent, release, waiver, modification or assumption agreement or understanding" that arise from the negotiation is insufficient unless written and signed – that is, formalized.  (Doc. 154-1 at 8)  But nothing in the pre-negotiation letter agreement directly affects the underlying loan

---

[7] Although the first list ("compromise, consent, release, waiver, modification or assumption agreement or understanding with respect to the Loan or the Loan Documents") in section 5 is arguably more comprehensive than the second list ("agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents"), neither the change in terminology nor the change in the order of the listed items differentiates the two lists. Even if each party agreed to "understanding" in the first list as a catch-all provision, using the canon *ejusdem generis* – of the same kind – "understanding" is limited to actions that directly affect the loan agreement, as would a "compromise, consent, release, waiver, modification or assumption agreement." (Doc. 154-1 at 8) The pre-negotiation letter agreement, an agreement to negotiate for modification of the loan agreement, is not an "understanding" as characterized in section 5. An agreement to negotiate is, at best, a step removed from directly affecting the loan agreement.

- 13 -

agreement. For example, CPX Tampa signed the pre-negotiation letter agreement after defaulting on the loan. However, rather than promising to extend the loan, the Bank clarified that the Bank had no "obligation to discuss, pursue or agree to any modifications, consents or approvals or assumptions of the Loan." (Doc. 154-1 at 8) The signature requirement in section 5 of the pre-negotiation letter agreement is inapplicable to the pre-negotiation letter agreement. Contract principles, not section 5, must decide whether the parties mutually assented to the agreement.[8]

An "offer vests an offeree with the power of acceptance." *RPTS, Inc. v. FMC Tubular & Equip. Corp.*, 2012 WL 366876, at *1 (Ohio Ct. App. Feb. 6, 2012) (Dickinson, J.). By sending the pre-negotiation letter agreement to CPX Tampa on February 1, 2011, the Bank vested the power of acceptance in CPX Tampa. CPX Tampa knew that the Bank required the agreement "to continue" negotiations after the loan agreement expired on February 1 and that the Bank designated a signature "by the borrower" as the method of acceptance (Doc. 184 at 18) Although Leslie O. Andren, senior vice-president of the Bank, failed to sign the signature space in the

---

[8] In the current motion, the parties agree that the "interpretation and enforcement" of the loan agreements are governed by Ohio law. (Doc. 154 at 7; Doc. 184 at 27 n.18) The parties also agree that the "interpretation and enforcement" of the pre-negotiation letter agreement are governed by Kentucky law. (Doc. 154 at 7 n.8; Doc. 184 at 27 n.18) However, CPX Tampa disputes the enforceability of the pre-negotiation letter agreement by arguing that the pre-negotiation letter agreement lacks mutual assent and consideration.

Neither interpretation nor enforcement of the agreement explains whether the pre-negotiation letter agreement is supported by mutual assent and consideration, which are issues of contract formation. However, in *Corporex*, the parties "agreed that there is no material difference between Kentucky and Ohio law and did not object to the consideration of the laws of both states in adjudicating the pending motions." *Corporex*, 875 F. Supp. 2d at 696. Therefore, both Kentucky and Ohio law contribute to resolving an issue of contract formation.

agreement before she sent the agreement to CPX Tampa, "signature spaces in a contract do not in and of themselves require that signatures of the parties are a condition precedent to the agreement's enforceability." *Beck Aluminum Int'l, LLC v. Aluar Aluminio Argentino S.A.I.C.*, 2010 WL 3260017 (N.D. Ohio Aug. 18, 2010) (Gaughan, J.) (internal quotation marks omitted).

Even if CPX Tampa's returning the signed agreement is the offer, the Bank subsequently accepted the offer by sending CPX Tampa the updated term sheet. *See Tlg Elec., Inc. v. Newcome Corp.*, 2002 WL 338203, at *2 (Ohio Ct. App. Mar. 5, 2002) (Bryant, J.) ("Conduct sufficient to show agreement, including performance, is a reasonable mode of acceptance."). The Bank promised to send an updated term sheet on the loan once CPX Tampa returned the signed pre-negotiation letter agreement, and the Bank sent the sheet "within days after receiving the signed agreement." (Doc. 154 at 13) In either scenario, each party manifested assent to the agreement.

### *B. Consideration*

The Bank argues that the pre-negotiation letter agreement is supported by consideration because the Bank negotiated to modify the loan agreement, even though the Bank had no obligation to negotiate. (Doc. 154 at 14) CPX Tampa responds that the pre-negotiation letter agreement lacks consideration because the Bank failed to identify "any causes of action or claim they had against [CPX Tampa]

which they were waiving." (Doc. 184 at 20 (quoting *George v. First Am. Bank*, 1973, 1991 WL 156532, at *6 (Ohio Ct. App. Aug. 14, 1991) (Harsha, J.))

"[M]utual promises form a valid consideration for an agreement; but, in order for that to be so, there must be a benefit to the promisor, or a detriment to the promisee." *Robbins v. Robbins*, 246 Ky. 411, 411 (1932). The Bank incurred a "detriment" by delaying foreclosure on CPX Tampa's property in order to negotiate a possible extension of CPX Tampa's defaulted loan. Further, the parties agreed to relieve the other parties "from any and all liabilities . . . arising out of . . . all or any Loan Communications," which further indicates that the parties created a "mutual promise," which is a valid consideration. (Doc. 154-1 at 4)

### *C. Fraudulently Induced*

Although the pre-negotiation letter agreement is supported by mutual assent and consideration, fraud in the inducement voids an agreement. The Bank argues that even if it "false[ly] promise[d] to negotiate in good faith," "any reliance on such statements was unreasonable." (Doc. 154 at 15-17) CPX Tampa responds that because it "uncovered numerous indicia of bad faith and misrepresentations during [the] negotiations," "[w]hether the [pre-negotiation letter agreement] was fraudulently induced is a question of fact, which precludes summary judgment." Doc. 184 at 14)

A summary judgment posture must "assum[e] all reasonable inferences in favor of [the non-movant]. *Lippert v. Cmty. Bank, Inc.*, 438 F.3d 1275, 1282 (11th Cir.

2006). Reasonable inferences of CPX Tampa's "numerous indicia of bad faith and misrepresentations" create a genuine issue of material fact about the Bank's fraudulently inducing the pre-negotiation letter agreement.

CPX Tampa alleges (1) that the Bank "had already begun the process of downgrading the loans" in May 2010 (Doc. 184 at 4); (2) that a 2010 internal directive from Douglas Robinson, a "high-ranking Bank officer," to "get ours first" meant for the Bank to "get its money and terminate its relationship with [CPX Tampa]" (Doc. 184 at 5); (3) that the Bank "told [CPX Tampa] not to refinance because [the Bank] could offer better terms" (Doc. 184 at 5); (4) that the Bank "represented to [CPX Tampa] that [a notice unfavorable to CPX Madison] was 'just a formality'" (Doc. 184 at 6); (5) that the Bank lied in explaining that the Bank transferred CPX Tampa's loan to the Special Assets Group for "flexibility" (Doc. 184 at 6); (6) that a designation of "out" meant that the Bank intended to "work to the end the relationship and . . . not entertain any modifications to extend the loan" (Doc. 184 at 7); (7) that the Bank intended to "string [CPX Tampa] along until the loan was in default" (Doc. 184 at 7); (8) that "Andren clearly understood that [the Bank] intended to foreclose" (Doc. 184 at 7); and (9) that "Andren told [CPX Tampa] that she would work to get a three year extension for [CPX Madison]" order to appear to be negotiating in good faith" (Doc. 184 at 8). These allegations and inferences, as a whole, create a genuine issue of material fact about the Bank's fraudulently inducing the pre-negotiation letter agreement. Whether CPX Tampa

- 17 -

acted in reasonable reliance creates a question of fact not handled in a motion for summary judgment. *See Bunton*, 1993 WL 164648, at *2 ("The Ohio Supreme Court has . . . held that 'reasonable reliance' is a question of fact which cannot be resolved on a summary judgment motion but, rather, is for the trier of fact.").

## CONCLUSION

The Bank's motion for summary judgment (Doc. 154) is **DENIED**.

ORDERED in Tampa, Florida, on September 12, 2014.

/s/ Steven D. Merryday
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE